**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION, EAST ST. LOUIS, ILLINOIS**

| | | |
|---|---|---|
| RANA SCHMIDT, as the Independent Administrator of THE ESTATE OF ELISSA A. LINDHORST, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:22-cv-329 |
| JOHN D. LAKIN, as the Sheriff of Madison County, MADISON COUNTY, Deputy HURST, DEPUTY PAULDA, SGT. SARHAGE, ALISIA RUSHING, DEPUTY GOODWIN, DEPUTY CALDWELL, DEPUTY DECKER, LT. FOSTER, SGT. RICHERT, DEPUTY WILSON, LT. COURT, SGT. BARDELMEIER, SGT. McNAUGHTON, DEPUTY WALLENDORFF, DEPUTY BURDEN, DEPUTY WHITECOTTON, DEPUTY HARING, ADVANCED CORRECTIONAL HEALTHCARE, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Jury Trial Demanded |
| Defendants. | ) ) ) ) | |

**COMPLAINT**

NOW COMES the Plaintiff, RANA SCHMIDT, as the Independent Administrator of THE

ESTATE OF ELISSA A. LINDHORST, deceased, by MEYER & KISS, LLC, her attorneys, and

complaining of the Defendants states the following:

**Introduction**

1.     On February 24, 2020, Elissa Lindhorst (hereafter Elissa) died in a cell at the Madison

County Jail. She did not deserve to die, and her death was preventable. From February

20, 2020, until her death on February 24, 2020, numerous employees of the Madison

County Sheriff's Department observed Elissa's health decline yet failed to take any

1

steps to get her the much needed and medical attention she needed. Elissa was only 28 years old.

2.    Prior to her death, fellow detainees in the Madison County Jail heard Elissa beg for help and state that she felt like she was dying. These fellow detainees did all they could to help Elissa. They received no assistance from the Defendants, except for a mop and bucket to clean up Elissa's vomit.

3.    No one responded to Elissa's pleas for help. The callous inattention displayed by the medical staff and correctional officers left Elissa without crucial medical treatment that resulted in her death.

4.    Elissa was in obvious need of emergency medical care resulting from opioid dependency and withdrawal. The Defendants were aware that Elissa was going through withdrawal, yet they failed to take any action.

5.    The Jail has an agreement with ADVANCED CORRECTIONAL HEALTHCARE, INC. ("ACH") to provide medical services and care to individuals detained at the Jail.

6.    Elissa was not the first inmate to suffer severe medical problems or death in county jails that have contracted with ACH, specifically as a result of the failure to render aid to individuals suffering from drug overdoses or withdrawal.

7.    Defendants Madison County Sheriff JOHN D. LAKIN and ACH failed to implement any meaningful training or provide continuing education to their employees that focused on the signs, symptoms, and consequences of drug intoxication and/or withdrawal of detainees being held in the Jail and the need to render prompt and adequate medical care.

8.   ACH, in pitching its contract for jail medical services to various counties, has stated that the company avoids major costs by having persons in custody with the worst medical emergencies released on their own recognizance or "sent somewhere else" so ACH and the county can avoid responsibility for their care and the costs associated with it.

9.   This policy and/or practice by ACH and the Jail is, in part, what caused the failure to provide the most basic response to Elissa's medical needs.

10.   Notably, In the hours leading up to Elissa's death, surveillance video shows fellow detainees pulling Elissa out of her cell and attempting to provide medical care as they yell repeatedly for help.

**Jurisdiction and Venue**

11.   This Court has jurisdiction over this matter under the following:

a.   28 U.S.C. § 1331, as this is a civil action arising under the Constitution, laws, and/or treaties of the United States;

b.   28 U.S.C. § 1337, as this is a civil action or proceeding arising under an Act of Congress regulating commerce and/or protecting trade and commerce against restraints and monopolies; and

c.   28 U.S.C. § 1343, as this is a civil action seeking to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom and/or usage, of a right, privilege or immunity secured by the Constitution of the United States and/or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

12.   Plaintiff's claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which

authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions pursuant to 42 U.S.C. § 1983.

13. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as Defendants do business in this judicial district and the events or omissions giving rise to the claims occurred in this judicial district.

**Parties**

15. RANA SCHMIDT is a resident of Glen Carbon, Madison County, Illinois. She is the duly appointed Independent Administrator of the Estate of ELISSA A. LINDHORST, deceased. Ms. SCHMIDT is the mother of the decedent and brings this action on behalf on the Decedent's next of kin.

16. At all times relevant to the issues raised in this Complaint, ELISSA A. LINDHORST, deceased, resided in Glen Carbon, Madison County, Illinois. Elissa, born on April 30, 1991, died while incarcerated as a pretrial detainee at the Madison County Jail on February 24, 2020.

17. From February 20, 2020, to February 24, 2020, Elissa, was a pre-trial detainee confined in Madison County Jail in Edwardsville, Illinois, a correctional facility maintained by Defendant Madison County Sheriff JOHN D. LAKIN ("Defendant LAKIN").

4

18.   At all relevant times, Defendant LAKIN was the duly elected Sheriff of Madison County and chief administrator of the Madison County Jail.

19.   At all relevant times, he was acting under color of law and in the course and scope of his employment as the agent, servant, and an official policy-maker for Defendant MADISON COUNTY on issues relating to care of prisoners in Madison County Jail and the policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit, and as the County's chief law enforcement officer. He is sued in his official capacity.

20.   Defendant LANKIN was the commanding officer of all Madison County Sheriff's deputies, correctional officers, and jail employees, and he was responsible for their training, supervision, and conduct.

21.   Defendant MADISON COUNTY is joined in this action pursuant to *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003).

22.   At all material times, ACH was and is responsible for the hiring, retaining, training, and supervising of its employees and agents, and was and is responsible for the conduct, policies and practices implemented and followed by its employees and agents.

23.   Defendant ACH is a corporation licensed and incorporated in Illinois, with its principal officers registered in Peoria, Illinois, doing business as a medical provider for various county jails, including Madison County Jail.

24.   At time material to this complaint, Defendant ALISIA RUSHING ("Defendant RUSHING") was a nurse at the Madison County Jail, employed by Madison County and Defendant

LANKIN, who was responsible for the well-being, medical care, and safety of detainees, including Elissa.

25.     At times material to this complaint, Defendants DEPUTY HURST, DEPUTY PAULDA, SGT. SARHAGE,  DEPUTY GOODWIN, DEPUTY CALDWELL, DEPUTY DECKER, LT. FOSTER, SGT. RICHERT, DEPUTY WILSON, DEPUTY WILSON, LT. COURT, SGT. BARDELMEIER, SGT. McNAUGHTON, DEPUTY WALLENDORFF, DEPUTY BURDEN, DEPUTY WHITECOTTON, and DEPUTY HARING ("Defendant Correctional Officers") were correctional officers at the Madison County Jail, employed by Madison County and Defendant LANKIN, who were responsible for the well-being and safety of detainees, including Elissa.

**Bases For Claim**

26.     The Plaintiff brings her claims on behalf of the decedent's Estate and the decedent's next of kin pursuant to the Illinois Survival Act, 755 ILCS 5/27-6, and the Illinois Wrongful Death Act, 740 ILCS 180/0.01-180/2.2, respectively.

27.     The Plaintiff brings her federal claims against the Defendants pursuant to 42 U.S.C. § 1983 for violations of Elissa's rights under the Fourteenth Amendment to the United States Constitution, which prohibits "deliberate indifference to the serious medical needs of pretrial detainees."

28.     The Plaintiff brings her state law claims pursuant to Illinois tort law against the Defendants for willfully and wantonly denying Elissa medical care while detained at the Madison County Jail. LAKIN is further named as a Defendant pursuant to 55 ILCS 5/3-6016, which provides that "the sheriff shall be liable for any neglect or omission of the deputies of his office, when occasioned by a deputy . . . in the same manner for his or

6

her own personal neglect or omission" and as the principal for the Defendant

Correctional Officers and Defendant RUSHING and the other unknown Madison County

Sheriff's employees.

**FACTS COMMON TO ALL CLAIMS**

**A.      ELLISA'S INCARCERATION AND DEATH**

29.     Prior to February 20, 2020, Elissa had long struggled with addiction issues.

30.     On February 20, 2020, Elissa appeared in Granite City, Illinois, for a court hearing.

31.     During her appearance, the presiding judge recognized Elissa as having an outstanding

warrant and notified Madison County Sheriff's deputies, who were working at the

Granite City Courthouse that day.

32.     Deputy Schneidewind and Deputy Saffell, responded to the Judge's notification. Deputy

Saffell confirmed the warrant by phone, determining that the warrant sought Elissa's

arrest for possession of a controlled substance.

33.     After confirming the warrant, Deputy Saffell took Elissa into custody, "without

incident," placed her into his patrol vehicle, and transported her to the Madison

County Jail.

34.     Elissa arrived at the jail at about 4:38 PM on Thursday, February 20, 2020. Once at the

jail, Deputy Saffell remained present until Elissa completed a body scan as part of the

intake process and then turned Elissa over to corrections, again, "without incident."

35.     During the booking process, consistent with Department policy, Deputy Tharp checked

Elissa's  Booking History Report. That report revealed that Elissa had previously been

booked in 2019, once for possession of a controlled substance and, a second time, for possession of methamphetamine.

36.   Consistent with Department policy, Deputy Tharp conducted a search of Elissa's person and belongings, including the body scan witnessed by Deputy Saffell and a strip search. Neither the search by Deputy Saffell at the time of the arrest nor the search during the booking process revealed contraband of any type, including drugs, alcohol, or other illicit substances, in Elissa's possession.

37.   Shortly after booking, Elissa became ill, began vomiting, and requested aid from the Deputy Kathy L. Nodine.

38.   Deputy Nodine observed that Elissa had become ill and was vomiting. Elissa told Deputy Nodine that she was withdrawing from an opioid.

39.   As a result of Elissa's illness, Deputy Nodine claims to have completed a sick slip form seeking medical assistance for Elissa. However, despite Department policy that requires such slips to be maintained in the detainee's file, no sick slip, dated February 20, 2020, is in Elissa's file.

40.   According to Deputy Nodine, she submitted the sick slip on February 20, 2020, when Elissa reported that she was withdrawing from an opioid. Nodine also reported that she submitted the sick slip to the jail infirmary, which is required by Department policy.

41.   Pursuant to Department policy, when a sick slip is submitted, the medical staff must decide if a detainee is to be seen and whether the detainee will be evaluated by a nurse or a doctor. Where an exam is approved, that exam is to occur after the distribution of medicine is completed the following morning.

8

42.     No medical staff member evaluated Elissa in response to the sick slip that Deputy

        Nodine claims to have submitted on February 20, 2020, and there is nothing in Elissa's

        file to suggest any consideration by the medical staff of Elissa's condition.

43.     In the early morning hours of February 21, 2020, Defendant HURST was informed by

        Deputy Nodine that Elissa was detoxing.

44.     While passing out breakfast, Defendant HURST observed that Elissa had vomited on the

        floor.

45.     During lunch on February 21, 2020, Defendant HURST once again witnessed Elissa

        vomit. By that point, Defendant HURST was aware that Elissa had not eaten any

        breakfast or lunch.

46.     Elissa was also unable to eat the dinner that was passed out by Defendant HURST.

47.     Defendant HURST never summoned or requested any medical attention for Elissa

        during her shift even after observing Elissa vomiting and becoming aware that she was

        withdrawing.

48.     At the end of Defendant HURST's shift, Defendant HURST informed Defendant PAULDA

        that Elissa had been sick the entire day and did not eat anything.

49.     Defendant PAULDA observed that Elissa was extremely sick yet failed to request any

        medical attention for Elissa.

50.     Through February 21, February 22, and February 23, 2020, Deputy Nodine and

        Defendants HURST, PAULDA, SGT. SARHAGE,  GOODWIN, CALDWELL, DECKER, LT.

        FOSTER, SGT. RICHERT, WILSON, LT. COURT, SGT. BARDELMEIER, SGT. McNAUGHTON,

        WALLENDORFF, BURDEN, WHITECOTTON, and DEPUTY HARING, never sought out or

provided any medical evaluation or care of any type to Elissa. All of these Defendants were aware that Elissa had not been eating, was vomiting and was withdrawing from an opioid.

51.  After the Deputy Nodine and Defendants HURST and PAULDA noted Elissa was vomiting on February 20, 2020, and into the early hours of February 21, 2020, the Defendant Correctional Officers observed Elissa's condition continue to deteriorate. She continued to vomit, could not eat, and could not drink liquids throughout the remainder of her incarceration at the Madison County Jail, which ended with her death on February 24, 2020.

52.  After Elissa requested aid from Deputy Nodine, on February 20, 2020, Elissa and her cellmates made repeated requests for medical assistance to multiple Defendant Correctional Officers.

53.  The Defendant Correctional Officers that came into contact with Elissa from February 20, 2020, through February 24, 2020, acted willfully and wantonly and with a deliberate indifference to Elissa's serious and deteriorating medical condition, ignored the repeated pleas for help from Elissa, and the other detainees, failed to assess Elissa, and failed to provide necessary medical care, which was at all times available to detainees at the Jail.

54.  On February 22, 2020, Defendants WALLENDORFF, LT. FOSTER, LT. COURT, WHITECOTTON, HARING, SGT. BARDELMEIER, and SCHREIBER all completed rounds in the female side of the jail and observed Elissa's deteriorating condition and observed that she had been vomiting. Defendants WALLENDORFF, LT. FOSTER, LT. COURT,

WHITECOTTON, HARING, SGT. BARDEIMEIER, and SCHREIBER all knew that Elissa was withdrawing from opioids, yet none of these individual defendants sought medical attention for Elissa.

55. On February 23, 2020, Defendants GOODWIN, CALDWELL, SGT. BARDELMEIER, DECKER, PAULDA, SCHREIBER, SGT. RICHERT, HARING, BURDEN, WILSON, LT. COURT, SGT. McNAUGHTON, WHITECOTTON, and LT. FOSTER all completed rounds in the female side of the jail and observed Elissa's deteriorating condition and observed that she had been vomiting and still had not been seen by any medical providers. Defendants GOODWIN, CALDWELL, SGT. BARDELMEIER, DECKER, PAULDA, SCHREIBER, SGT. RICHERT, HARING, BURDEN, WILSON, LT. COURT, SGT. McNAUGHTON, WHITECOTTON, and LT. FOSTER all knew that Elissa's deteriorating condition was due to her withdrawing from opioids, yet none of these individual defendants sought medical attention for Elissa.

56. Specifically on February 23, 2020, Defendants LT. COURT, SGT. BARDELMEIER, and WILSON spoke with Elissa, who told them she was going through withdrawal. Instead of getting Elissa medical attention, they provided the cell block with cleaning supplies and a Biohazard bag to clean the vomit out of Elissa's cell.

57. Defendant SGT. BARDELMEIER falsely stated in a report that he asked Elissa if she was doing "okay" and that she responded she was.

58. On February 23, 2020, the other detainees in the jail with Elissa were so concerned with her condition that they completed a sick call slip on her behalf, since Elissa was too sick to complete one herself. Upon information and belief, Defendant PAULDA

11

picked-up the sick call slip completed by the other detainees and threw it in the garbage.

59.   On the morning of February 24, 2020, Sergeant Hare of the Madison County Sheriff's Department found a handwritten note by the other detainees pleading for assistance for Elissa. Sergeant Hare found the note "in a trash container at the front of F4 which is utilized by guards."

60.   On February 24, 2020, at approximately 4:55 a.m., Defendant PAULDA spoke with Defendant SGT. SARHAGE and informed Defendant SGT. SARHAGE that Elissa was still sick from withdrawing. Defendants SGT. SARHAGE and PAULDA decided to go speak with Defendant RUSHING regarding Plaintiff's condition. Upon information and belief, this was the first time that medical staff was contacted regarding Elissa's condition.

61.   At approximately 5:00 a.m., Defendants PAULDA and SGT. SARHAGE went to the jail infirmary and spoke with Defendant RUSHING. Defendants PAULDA and SGT. SARHAGE told Defendant RUSHING about Elissa's withdrawal symptoms. Defendant RUSHING told Defendants PAULDA and SGT. SARHAGE to fill out a sick call slip for Elissa. Upon information and belief, Defendant ACH has a policy that prior to any detainee being seen by medical staff, a sick call slip needs to be completed.

62.   Even after being told of Elissa's condition and how she had been vomiting over the last three days, Defendant RUSHING refused to go see Elissa.

63.   On the morning of February 24, 2020, Deputy Nodine began her duty rounds at 6:00 AM. Shortly thereafter, she observed Elissa lying on the floor of her cell near the toilet. Willfully and wantonly and with reckless and deliberate indifference to Elissa's

condition, Deputy Nodine made no effort to check on Elissa, assess her condition, or call for medical staff assistance.

64. When Deputy Nodine made her next duty round thirty minutes later, at or about 6:30 AM, she found Elissa still lying in the same position. Willfully and wantonly and with reckless and deliberate indifference to Elissa's condition, Deputy Nodine made no effort to check on ELISSA, assess her condition, or call for medical staff assistance.

65. Thirty minutes later, at or about 7:00 AM, Nodine again found Elissa lying by the toilet, this time slightly rolled to one side. She noted Elissa raising her head and having vomit on her. Willfully and wantonly and with reckless and deliberate indifference to Elissa's condition, Deputy Nodine made no effort to check on Elissa, assess her condition, or call for medical staff assistance.

66. After completing her 7:00 AM duty round and without having checked Elissa's condition or called for medical staff assistance, Deputy Nodine began to distribute breakfast to the other inmates. Misty expressed her concern to Deputy Nodine about Elissa's condition and asked if she could give Elissa her breakfast. Willfully and wantonly and with reckless and deliberate indifference to Elissa's condition, Deputy Nodine watched Misty take Elissa her breakfast but did nothing herself to check on Elissa or call for medical staff assistance.

67. Some thirty minutes later, a little after 7:30 AM, Deputy Nodine began her duty rounds, again. This time, Nurse Bassett also began passing out morning medications to inmates in the same area of the jail where Elissa had been lying on the floor by her toilet for over an hour and a half.

68.    While Deputy Nodine made rounds and Nurse Basset handed out meds, Misty and

Michelle began yelling that Elissa had stopped breathing. The two cellmates had carried

Elissa from her cell into the main detainee walkway, by the time that Nodine and

Basset arrived.

69.    After ignoring Elissa's condition for more than three days and ignoring her grave

condition on the morning of February 24, 2020, for over an hour and a half, the

Defendant Correctional Officers employed by MADISON COUNTY and LAKIN finally

began to give attention to Elissa's deteriorating medical condition: Deputy Nodine

assisted Nurse Basset with cardiopulmonary resuscitation.

70.    Unfortunately for Elissa, due to the deliberate indifference of the Defendant

Correctional Officers and Defendant RUSHING, during the time between Elissa's

admission to the Madison County Jail and the morning of February 24, 2020, Elissa's

condition had progressed to the point of severe dehydration, and she had aspirated her

vomit, causing her lungs to become congested and inflamed.

71.    By the time that the Defendant Correctional Officers and Defendant RUSHING provided

care to Elissa, she could not recover from those injuries. At 8:30 AM on February 24,

2020, Dr. Grant Gerdelman, M.D. pronounced her dead.

    **B.    THE SETTING FOR ELISSA'S INCARCERATION**

72.    In 2019, the National Institute for Drug Abuse reported 70,630 deaths from drug abuse,

including "those caused by synthetic opioids other than methadone (primarily

fentanyl)," which accounted for over 36,000 of those deaths. According to the Centers

for Disease Control, "synthetic opioids other than methadone are the main driver of overdose deaths."

73.  In Illinois' fiscal year (SFY) 2018, methamphetamine-related offenses led to 1,017 Illinois Department of Corrections admissions. Methamphetamine-related admissions accounted for 4 percent of all admissions and almost 18 percent of all drug admissions that year.[48] From SFY12 to SFY18, Illinois prisons experienced a 67 percent increase in the number of individuals admitted for a methamphetamine offense, rising from 967 individuals in 2012 to over 1,600 in 2018.[50]

74.  The Centers for Disease Control reports that in Illinois alone, during 2018, over 2,700 people died as a result of drug overdose.

75.  The risk attendant to drug overdoses and withdrawal from drugs were and should have been well known to the Defendants LAKIN, ACH and MADISON COUNTY, and these Defendants had a duty under the U.S. Constitution to enact policies and procedures to protect pretrial detainees, including Elissa, from said risk including the development of policies and training to guide their employees, including the Defendants, in the care and supervision of detainees suffering from emergency medical conditions.

**C.    THE POLICIES AND REGULATIONS GOVERNING ELISSA'S INCARCERATION**

76.  At all times relevant to the issues raised in this Complaint, the Madison County Sheriff's Office had in full force and effect its Policy number 1100, Co-Payment for Prisoner Medical Services. Under that Policy, the Sheriff's office recognized its obligation to "provide services to all detainees pursuant to and consistent with the Illinois Department of Correction-County Jail Standards."

77.    At all times relevant to the issues raised in this Complaint, the Illinois Department of Correction maintained its County Jail Standards, Ill. Admin. Code 20 § 701.5-701.280, governing the responsibilities of County jails throughout Illinois, including Madison County.

78.    The Illinois Department of Correction's County Jail Standards, §701.40(i)(3), requires Illinois jails to refer detainees for medical evaluation "[w]hen a detainee shows signs of or reports unusual physical or mental distress." The Defendants LAKIN, ACH and MADISON COUNTY had no policy in place requiring such medical evaluation for detainees, including Elissa.

79.    The Illinois Department of Corrections County Jail standards, §701.90(b)(1), requires that a physician be available "to attend the medical and mental health needs of detainees." Upon information and belief, the Defendants LAKIN, ACH and MADISON COUNTY, had no policy providing for a physician to be available for detainees, including Elissa.

80.    The Illinois Department of Corrections County Jail standards, §701.90(d)(1), requires the jail to provide a daily sick call and, under §701.90(d)(3), requires detainees with emergency conditions to "receive attention as quickly as possible, regardless of the sick call schedules." The Defendants LAKIN, ACH and MADISON COUNTY had no policy in place that permitted detainees, including Elissa, to receive prompt, immediate care of emergency conditions like that suffered by Elissa.

81.    Under Madison County Sheriff's Office Policy number 1100.5(a), all deputies had an obligation to "dispense sick slips upon request and with each Medication Pass …[and]

16

see that the slips are returned to the infirmary ….." The Defendants LAKIN, ACH and MADSION COUNTY, failed to train their employees, including the Defendant Correctional Officers, on the use of sick slips or on the obligation to avoid this prerequisite to medical care in emergency situations, like that experienced by Elissa.

82.   Under that same policy, 1100.5, Subsection (b), medical staff are to determine "when and if the prisoner should be seen on either the next Nurse Call or Doctor Call."  The policy further requires that all sick slips be maintained in the detainee's medical file. The Defendants LAKIN, ACH and MADISON COUNTY, failed to train the employees, including the Defendant Correctional Officers, on the need to seek immediate medical attention for emergency medical conditions like that suffered by Elissa and to recognize those conditions requiring immediate medical assistance and the need to dispense with sick slip requirements.

83.   Defendants ACH, COUNTY and LAKIN never developed any policy that defined for their employees, including the Defendant Correctional Officers, when detainees should receive medical attention, other than upon the completion of a sick slip; that defined or provided guidance on when a medical condition should be determined to be an emergency; or that defined or offered guidance to officers concerning the signs or symptoms of drug overdose, withdrawal, dehydration, or other medical conditions that pose a threat of significant harm or to the life of detainees.

84.   Defendants LAKIN, COUNTY and ACH failed to train jail employees, including the Defendant Correctional Officers and Defendant RUSHING, to recognize serious medical conditions, including drug overdoses and withdrawal, to understand the significant risk

17

of harm posed by drug overdoses and withdrawal, and failed to provide necessary

training and guidance to jail employees in determining the need for necessary medical

assistance.

D.      **MADISON COUNTY'S HISTORY OF ISSUES WITH DETAINEE SAFETY**

85.    Madison County has a significant history of issues with detainee safety, including thirty-

six suicide attempts and three successful suicides over the five years from 2005

through 2010. *See Pittman ex rel. Hamilton v. County of Madison, Ill.* 746 F.3d 766, 773

(2014).

86.    There have been many other incidents involving injuries to detainees since 2010. In

2017, an inmate smuggled narcotics into the Madison County jail, where three

detainees, who consumed the drugs, required medical attention, including

hospitalization, for their intoxication. www.riverbend.com/articels/details/three-

femaile-madison-county-jail-inmates-treated-for-suspected-opioidbased-overdoses-

20145.cfm.

87.    In 2016, an inmate beat to death another inmate in Madison County Jail. The injured

victim of the beating did not receive assistance from jail officers for almost two hours

after the beating. www.thetelegraph.com/new/article/Caught-on-camera-Inmate-

beaten-to-death-12710270.php.

E.      **ACH'S HISTORY OF PROVIDING MEDICAL CARE IN COUNTY JAILS**

88.    Defendant ACH markets itself to jails based on its cost-cutting model, which includes

procedures wherein it contracts with the jails to have minimal to no medical staff

present at the jail.

89. ACH employs an "on-call" doctor who only visits a jail in person on rare occasions and covers multiple jails in a large region managing the medical needs of those in custody by telephone.

90. Little to no medical staff are employed physically at the jails contracting with ACH, relying instead on correctional staff who have no formal medical training and cannot adequately assess and address residents' medical needs.

91. When medical care is provided, ACH aims to provide the cheapest, most minimal response, for the purpose of eliminating costs and maximizing profits for the company.

92. This minimalist, penny-pinching approach results in woefully deficient medical care to residents.

93. ACH is aware that this approach has failed to provide adequate medical care to people in custody, resulting in treatable or manageable medical needs developing into serious, life-threatening conditions for inmates.

94. When that happens, as in Elissa's case, the inmate is released on their recognizance, discharged from the jail, and sent to a hospital, at which point the cost for the completely avoidable and emergent medical treatment is endured by the former inmate, who also bears the extensive pain and suffering

95. For example, in November 2013, in a case very similar to Plaintiff's, Kenneth Collins was arrested for DUI with a BAC of 0.28.

96. Upon admission to the jail in Jackson County, Indiana, Collins anticipated he would be suffering severe alcohol withdrawal and he requested to be admitted to a hospital.

97. Collins' request was denied, and he began to experience severe delirium tremens as a

result of withdrawal, a medical emergency with a high mortality rate.

98.   Collins remained in jail, where staff observed that he was delirious, not eating, lying on

the floor, and unable to converse or maintain eye contact.

99.   Over the course of a week, Collins' condition continued to deteriorate, and he

experienced seizures, broken ribs, hypothermia, hypertension, acute respiratory failure,

dehydration and acute kidney injury.

100.   In this dire condition, Collins was released on his own recognizance and hospitalized,

with the costs of his medical care transferred to him from the county.

101.   At the hospital, he was sedated and put on a ventilator in the ICU, where he remained

for 8 days.

102.   In another incident, in March 2013, at the Grant County Jail in Kentucky, ACH's on-call

doctor and on-site nurse failed to provide medical care or adequately respond to Danny

Ray Burden, a diabetic individual experiencing an emergency hyperglycemic episode

during the booking process.

103.   Despite multiple signs of severe distress, Danny Ray Burden was not taken to the

hospital until he was unresponsive.

104.   The hospital admitted him for "altered mental state and cardiac arrest." Mr. Burden

died a week later.

105.   ACH lost their contract with that detention center as a result.

106.   The case of Nicholas Banning is strikingly similar to the occurrence here.

107.   Mr. Banning was booked in Shelby County Jail in Illinois. He informed the correctional

staff that he was opiate-dependent and would experience withdrawal. ACH did not

implement or train the correctional staff on opiate withdrawal and therefore Mr.

Banning was forced to withdraw without any medical assistance or aid.

108.   Over the course of a couple of days, Mr. Banning's withdrawal became so severe he

developed asphyxia pneumonia and required treatment for five weeks in an ICU.

109.   As of February 2020, defendant ACH had established and maintained a policy, de facto

policy, or custom of routinely and systematically denying necessary medical treatment

to inmates at facilities where it was contracted to provide medical care. This policy, de

facto policy, or custom included refusing to summon emergency medical services for

detainees like Elissa who are clearly experiencing a medical emergency. It is common at

facilities where ACH provides medical services to observe inmates with clear symptoms

of serious medical illness, injury, or conditions, who frequently ask for medical care or to

see a doctor, whose requests are routinely delayed or completely ignored by medical

personnel. Further, it is common at facilities where ACH provides medical services for

ACH to unjustifiably and unconstitutionally withhold access to hospital care where it is

required for the inmate's health and wellbeing. This widespread practice is allowed to

flourish because Defendant ACH, which directs the provision of health care services at

Madison County Jail, directly encourages and is thereby the moving force behind the

very type of misconduct at issue by failing to adequately train and supervise medical

personnel and sheriff deputies at Madison County Jail and other facilities where ACH is

contracted to provide medical care. By failing to adequately punish and discipline prior

instances of similar misconduct, it directly encourages future abuses such as those

experienced by Elissa. In this way, ACH violated Elissa's rights by maintaining policies

and practices that were the moving force driving the foregoing constitutional violations. The above-described widespread practice, so well settled as to constitute de facto policy at Madison County Jail, was able to exist and thrive because governmental policymakers with authority over Defendant ACH, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

110.   Defendant ACH's policy, de facto policy, or custom of routinely and systematically denying necessary medical treatment to inmates at facilities where it was contracted to provide medical care in order to maximize its profits is so widespread that it has attracted national media attention. A CBS News investigation documented several instances of inmates dying from needless, preventable deaths, in facilities that contracted with ACH, as a result of ACH's refusal to provide proper medical care to inmates, and its refusal to permit hospitalization of inmates who are critically ill and are in obvious, desperate need of hospital care. https://www.cbsnews.com/news/broken-jail-healthcare-system-poses-danger-behind-bars/. The actions and inactions of the Defendants as alleged herein were in furtherance of ACH's policy, practice, or custom as described above.

**Causes of Action:**

**COUNT I**
**Claims under 42 U.S.C. 1983:**
**ALISIA RUSHING, DEPUTY HURST, DEPUTY PAULDA, SGT. SARHAGE,  DEPUTY GOODWIN, DEPUTY CALDWELL, DEPUTY DECKER, LT. FOSTER, SGT. RICHERT, DEPUTY WILSON, DEPUTY WILSON, LT. COURT, SGT. BARDELMEIER, SGT. McNAUGHTON, DEPUTY WALLENDORFF, DEPUTY BURDEN, DEPUTY WHITECOTTON, and DEPUTY HARING**

111.   Plaintiff re-alleges the above allegations as if fully set forth herein.

112.   Plaintiff is entitled to relief against Defendant Correctional Officers under 42 U.S.C. §
1983, based on violation of the Fourteenth Amendment to the U.S. Constitution.

113.   At all times material, Elissa had a constitutionally protected right under the Fourteenth
Amendment to the U.S. Constitution to receive necessary care while in the Madison
County Jail, and to have her serious medical needs timely and properly assessed and
treated.

114.   Defendant Correctional Officers and Defendant RUSHING deliberately disregarded the
immediate and serious threat to the well-being of persons in the Madison County Jail in
need of medical treatment and exhibited deliberate and callous indifference to serious
medical and mental health needs, by denying access to immediate and structured
medical observation, assessment, and treatment necessary to treat serious medical
needs and prevent suffering and death.

115.   Defendant Correctional Officers and Defendant RUSHING were aware of the fact that
there were detainees at the Jail who suffered from severe medical needs and were at
risk of injury and/or death. Despite this knowledge, Defendant Correctional Officers
and Defendant RUSHING intentionally and knowingly failed to provide serious, ongoing
case management and treatment for such inmates and failed to regularly monitor their
medical health care needs.

116.   Defendant Correctional Officers and Defendant RUSHING knew at all times material to
this action that there was a substantial risk that detainees with serious medical issues,
left substantially untreated, could be seriously injured and/or die, that such injuries
and/or deaths were reasonably foreseeable, and that the risk of injuries and/or death

was imminent and immediate.

117.   Defendant Correctional Officers and Defendant RUSHING deliberately disregarded the immediate and serious threat to detainees' medical health and well-being and exhibited deliberate indifference and callous indifference to their serious medical and psychological needs by denying and unreasonably delaying access to competent health care to treat their serious medical issues.

118.   In light of the aforementioned, Elissa suffered from both an objectively and subjectively substantial risk of serious harm while under the care and custody of Defendant Correctional Officers and Defendant RUSHING.

119.   Defendant Correctional Officers and Defendant RUSHING responded to this risk in an objectively and subjectively unreasonable manner.

120.   As a result of Defendant Correctional Officers' disregard of and indifference to Elissa's constitutionally protected right to be provided with proper care, Plaintiff's medical needs were ignored and it is more likely than not that the failures of Defendant Correctional Officers and Defendant RUSHING as alleged above were the proximate cause of Elissa's death.

121.   As a direct and proximate result of Defendant Correctional Officers' deliberate indifference to Elissa's serious health needs, Elissa dies on February 24, 2020.

WHEREFORE, Plaintiff prays for judgment as stated in the Prayer for Relief.

### COUNT II
### *Monell* Claim under 42 U.S.C. 1983:
### Defendants LAKIN and ACH

122.   Plaintiff re-alleges the above allegations as if fully set forth herein.

123.   The violations of Elissa's constitutional rights under the Fourteenth Amendment to the United States Constitution, her damages and the conduct of the individual Defendants, were directly and proximately caused by the actions and/or inactions of Defendant ACH and Defendant LAKIN, in his official capacity as the final policy-maker as Sheriff of Madison County, who have, with deliberate indifference:

a.   failed to establish and/or implement policies, practices and procedures to ensure that detainees at the Madison County Jail receive prompt and appropriate medical care for serious medical needs, including specifically providing monitoring and care by medically-trained personnel for individuals experiencing drug withdrawal or intoxication/overdose;

b.   failed to adequately assess and provide adequate care and treatment for detainees exhibiting signs of distress;

c.   failed to adequately monitor the deteriorating mental and medical health conditions of detainees;

d.   failed to ensure through training, supervision and discipline that correctional, supervisory and medical staff at or assigned to the Madison County Jail, in necessary circumstances, make a prompt referral for health care services outside the Jail;

e.   failed to ensure through training, supervision and discipline that correctional and medical staff adequately communicate and document inmates' deteriorating mental and medical health conditions;

f.   failed to ensure through training, supervision and discipline that correctional

and medical staff properly respond to inmates' deteriorating mental and

medical health conditions;

g.      possessed knowledge of deficiencies in the policies, practices, customs and

procedures concerning detainees, and approved and/or deliberately ignored

these deficiencies.

WHEREFORE, Plaintiff prays for judgment as stated in the Prayer for Relief.


**COUNT III**
**Wrongful Death Act Pursuant to Illinois Law**
**Defendant ACH**

124.    Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

125.    Elissa A. Lindhorst is survived by her mother, Plaintiff RANA SCHMIDT, and her sisters,

Kaci Lindhorst Sokoloff, Sara Lindhorst Cox, and Jody O'Mara, who constitute her

heirs under Illinois law.

126.    Decedent Elissa A. Lindhorst was officially pronounced dead on February 24, 2020.

127.    Defendant ACH's Employees, Agents or Contractors (collectively referred to hereafter

as "ACH Employees") had a duty to Ms. Lindhorst to exercise reasonable care according

to the conditions known to them or that, through reasonable care that should have

been known to them, in accordance with the standards of care in the community of

social workers.

128.    ACH Employees breached their duty to Ms. Lindhorst to exercise reasonable care

according to the conditions known to them or that, through reasonable care should

have been known to them, in accordance with the standards of care in their respective

professional communities.

129.   ACH Employees had a duty to adequately evaluate and document Ms. Lindhorst's

medical needs treatment each time they observed that her needs were not otherwise

being met.

130.   ACH Employees saw Ms. Lindhorst throughout the time she was in custody at the

Madison County Jail and failed to adequately evaluate and document Ms. Lindhorst's

medical needs.

131.   ACH Employees failed to examine Ms. Lindhorst on February 24, 2020, as her medical

health was quickly deteriorating.

132.   On information and belief, ACH Employees never sought supervision or guidance for

decedent's life-threatening situation.

133.   ACH Employees were negligent and deviated from the standard of care in one or more

of the following respects:

a.     Although Ms. Lindhorst objectively suffered from a serious medical

issue, ACH employees failed to adequately intervene and determine

that a health emergency existed;  and

b.     ACH employees failed to properly diagnose and treat Ms.

Lindhorst's serious medical health issues.

134.   The injuries and death suffered by Ms. Lindhorst were proximately caused by the

negligence, breach of duty of the standard of care, neglect, default, and/or willful and

wanton conduct of the ACH Employees, as described above, in violation of 740 ILCS §

180/1.

135.   The negligent and wrongful conduct of the ACH Employees was the direct and proximate cause of injury and damage to Ms. Lindhorst and her Estate.

136.   As next of kin, the heirs of Ms. Lindhorst have lost and will continue to lose, consortium, society, companionship as well as the love and affection of their cherished daughter and have incurred funeral and burial experiences as a proximate result of his wrongful death.

WHEREFORE, Plaintiff prays for judgment as stated in the Prayer for Relief.

## COUNT IV
### Survival Act Claim Pursuant to Illinois Law
### Defendant ACH

NOW COMES Plaintiff RANA SCHMIDT, as the Independent Administrator of THE ESTATE OF ELISSA A. LINDHORST, deceased, by MEYER & KISS, LLC, her attorneys, and complaining of the Defendant ACH, states:

137.   Plaintiff re-alleges the above allegations as if fully set forth herein.

138.   As a direct and proximate result of the reckless or deliberate indifference of ACH's employees, ELISSA suffered substantial pain and discomfort prior to her death and suffered severe emotional distress and her Estate incurred medical bills and funeral expenses.

139.   This action and the damages sought by the Plaintiff are authorized by the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff prays for judgment as stated in the Prayer for Relief.

**COUNT V**
**Indemnification Claim pursuant to 745 ILCS 10/9-102**
**Defendant Madison County**

140.    The acts of the individual Defendants who were deputies, correctional officers and

jail employees of the Madison County Sheriff, described in the above claims, were

willful and wanton, and committed in the scope of employment.

141.    Defendant MADISON COUNTY is joined in this action pursuant to *Carver v. Sheriff*

*of LaSalle County*, 324 F.3d 947 (7th Cir. 2003).

142.    Pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/9-102, Defendant

MADISON COUNTY is liable for any judgments in this case arising from the

Defendants' actions.

WHEREFORE, Plaintiff asks that this Honorable Court order Defendant MADISON COUNTY to

indemnify the individual Madison County Sheriff Defendants for any judgment entered in this

case arising from their actions.

**Damages**

A.  The Estate of ELISSA A. LINDHORST has sustained the following damages:

1.  funeral and burial expenses incurred as a result of decedent's death that have

become a charge against his Estate or that were paid on his behalf;

2.  loss of prospective net Estate accumulations;

3.  decedent's conscious pain and suffering and the inherent value of life;

4.  pre- and post-judgment interest; and

5.  loss of earnings of Elissa from the date of her death, less lost support of her

survivors excluding contributions in kind with interest.

Accordingly, Plaintiff respectfully requests that the Court award Plaintiff the aforementioned damages; any and all other compensatory damages suffered by Plaintiff; punitive damages; attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and such other and further relief as the Court deems just and equitable.

**Prayer for Relief**

WHEREFORE, the Plaintiffs seek judgment as follows:

A.    Compensatory damages against each of the Defendants herein;

B.    Punitive damages against Defendants sued individually;

C.    Attorney's fees pursuant to 42 U.S.C. § 1988 and costs of litigation;

D.    A trial by jury on all issues so triable;

E.    Such further relief as the Court deems just and proper.


Respectfully Submitted,

*s/Daniel P. Kiss*

Louis J. Meyer
Daniel P. Kiss
MEYER & KISS, LLC
53 W. Jackson Boulevard
Suite 724
Chicago, Illinois 60604
(312)765-0100
dankiss@meyerkiss.com